UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

**F I L E D**

Apr 01 2025

Arthur Johnston, Clerk

By: _____ , Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

**SOUTHWEST PHARMACY, INC.**
**D/B/A GUY'S MEDICAL CENTER**
**PHARMACY; GUY'S PHARMACY OF**
**TYLERTOWN; GUY'S PHARMACY**
**OF SUMMIT; GUY'S PHARMACY OF**
**BROOKHAVEN; GUY'S PHARMACY**
**OF HAZLEHURST; GUY'S PHARMACY**
**OF CRYSTAL SPRINGS**                                   **PLAINTIFF**


**VS.**                          **CIVIL ACTION NO.:** 5:25-cv-31-KS-BWR


**CVS CAREMARK CORPORATION;**
**EXPRESS SCRIPTS HOLDING COMPANY;**
**MEDIMPACT HEALTHCARE SYSTEMS, INC;**
**OPTUMRX, INC.;**
**OPTUM, INC.;**
**OPTUMRX HOLDINGS, LLC;**
**OPTUM RX ADMINISTRATIVE SERVICES, LLC;**
**UNITED HEALTH GROUP**                                  **DEFENDANTS**

---

## COMPLAINT
## JURY TRIAL DEMANDED

---

### I.     NATURE OF THE ACTION

1.      This action arises from Defendants' conspiring to use unequal bargaining power to fix reimbursement rates to pharmacies for drugs they dispense. Defendants are four of the largest pharmacy benefit managers ("PBMs") in the United States: CVS Caremark Corporation ("Caremark"), Express Scripts Holding Company ("Express Scripts"), MedImpact Healthcare Systems, Inc. ("MedImpact"), and OptumRX, Inc., Optum, Inc., OptumRX Holdings, LLC,

OptumRX Administrative Serbives, LLC (Collectively "Optum") (Caremark, Express Scripts, MedImpact and Optum are referred to collectively as the "PBM Defendants").

2.          The PBM Defendants exist and operate in a very specific and concentrated market. Over half of the prescriptions filled in the United States are filled by Defendants Caremark and Express Scripts. These two PBMs, plus Optum Rx (the "Big 3" PBMs), process more than 80 percent, and the Big 6 PBMs (the Big 3, plus Humana, Prime Therapeutics, and Defendant MedImpact) process more than 95 percent.

3.          Over the years, the Defendants have integrated themselves vertically in the healthcare sector at various points in the chain of distribution for prescriptions. The PBMs have become juggernauts in their market, who control the price and access to prescriptions in the United States. Each Defendant is a subsidiary of some major healthcare entity who is vertically integrated via owning health insurance companies, mail-order, specialty, retail pharmacies, and in other entities in this market. The Defendants use this market power to restrain competition in their market, resulting in the mass closure of independent pharmacies. This in turn makes the PBMs affiliated pharmacies more money. Defendants have concocted a scheme to share pricing data with each other and other non-defendant PBMs using GoodRx's software. This scheme, which is executed with GoodRx's software, allowing the Defendants to find the lowest discount card available through any PBM. They then use this discount card transaction as a means to reimburse the pharmacy less than what they would get otherwise. This whole process is being made as quick and efficient as possible, by being made an automatic part of the transaction.

4.          Each of the PBM Defendants has a prescription discount card program.  These programs allow customers to buy prescriptions outside of their insurance, using the discount card. In the past, these programs helped people without insurance or whose insurance did not

cover a needed medication. Before the Defendants entered into this conspiracy, the customer had a choice of whether or not to use the discount card if they so choose but the price would not go toward their deductible. The Defendants charge a fee to each pharmacy on every discount card transaction, and they do not reimburse the pharmacy. Meaning the discounted price, after the PBM fee is paid, paid by the patient is the only revenue the pharmacy gets.  As a result, pharmacies often lose money on discount card transactions but initially agreed to honor them to foster customer loyalty and bring traffic into their stores.  Pharmacies usually lose money on these transactions but orginially agreed to them as a way to get more customers in. But in recent decades, the use of the discount card became a requirement, and due to the Defendants' now huge market power the pharmacies have no longer have a choice.

5.      In 2023, GoodRx announced partnerships with the Defendants, besides Optum. These partnerships created the automatic process of the Defendants using GoodRx's software to determine if another PBM is offering a lower price than the patient's PBM is. If there is one, the transaction then gets redirected to the PBM offering the lowest discounted price. The fee paid by the pharmacy for the discount card transaction is then split between GoodRx, the patient's PBM, and the PBM that processed the transaction. In this process there is no third-party that reimburses the pharmacy like a typical insurance transaction. The only revenue is from what the patient pays, minus the fee that is split amongst GoodRx and the two PBMSs involved.

6.      The PBMs get a part of each discount card transaction without having to reimburse the pharmacy. Meaning these transactions are more profitable for the Defendants' than normal insurance transactions. By doing this on a massive scale, the Defendants are claiming more money from each transaction and leaving the pharmacies with less revenue. This is killing the independent pharmacy in America.

7.        Hundreds of independent pharmacies have already been choked out by this anticompetitive conduct perpetuated by the Defendants. With fewer independent pharmacies comes less competition for the PBM Defendants, which eventually leads to lower quality of service, higher costs, and in rural America all they may have in their town is an independent pharmacy. The people in rural communities rely on their independent pharmacies to provide things like vaccines or individual care in the form of instruction on the use of complicated or dangerous medications.

## II.    JURISDICTION AND VENUE

8.        This suit is brought under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and being sought is treble damages, enjoinment of the Defendants' anticompetitive conduct, and other relief as allowed by Section 1 of the Sherman Act (15 U.S. C. § 1).

9.        This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) because the action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). Under 28 U.S.C § 1332(d), jurisdiction is proper since this is an action where the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest, and the parties are of diverse citizenship. Issues pertaining to state law are proper to be adjudicated in this Court under 28 U.S.C. § 1367.

10.        Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants each conducts business within this District, and a large part of the events giving rise to the claim occurred in this District. Venue in this Court is also proper under 28 U.S.C. § 1391 because a large part of the events giving rise to the Plaintiff's claims have taken place within this District and the Defendants' conduct business here.

11.        This Court has personal jurisdiction over Defendants because they transacted

4

business throughout Mississippi and this District, have substantial contacts within this District and state, and are engaged in an illegal anticompetitive scheme that is directed at, and has intended effect of causing harm to Mississippi citizens and businesses.

12.     The actions of the Defendants and their co-conspirators occurred within the flow of interstate and intrastate commerce and the effects were reasonably foreseeable as well as major.

13.     This action also seeks an injunction to prevent the Defendants from further violating Section 1 the Sherman Act.

14.     No other forum would be more convenient for the parties and witnesses to litigate this case. Most of the witnesses, evidence, and the Plaintiff are all in this state. The Defendants all maintain some kind of presence in the state as well.

### III.    THE PARTIES

15.     Plaintiff Southwest Pharmacy, Inc.  d/b/a/ Guy's Pharmacy of Crystal Springs, Guy's Pharmacy of Tylertown, Guy's Medical Center Pharmacy, Guy's Pharmacy of Summit, Guy's Pharmacy of Brookhaven, and Guy's Pharmacy of Hazlehurst is a pharmacy with its principal place of business at 312 Marion Avenue, McComb, MS 39648. Plaintiff owns and operates multiple stores in multiple towns, all of which suffered damages.

16.     Defendant CVS Caremark Corporation ("CVS") is a Delaware corporation with its headquartered at 1 CVS Dr., Woonsocket, Rhode Island 02895.  CVS is a pharmacy benefit manager owned entirely by CVS Health Corporation ("CVS Health").  Other entities owned by CVS Health include, CVS Pharmacy and specialty pharmacy, and Aetna, Inc., the nation's third-largest health insurer.  CVS transacts business in this District and throughout Mississippi. They

can be served with process at C.T. Corporation system located at 645 Lakeland East Dr., suite 101, Flowood, MS 39232.

17.     Defendant Express Scripts Holding Company ("Express" or "Express Scripts") is a Delaware corporation with its headquartered at 1 Express Way, St. Louis, Missouri 63121. Express is a pharmacy benefit manager and owned entirely by the Cigna Group.  Other business entities owned by the Cigna Group include Cigna Healthcare, the nation's seventh-largest health insurer, and Evernorth Health Services, which operates a mail-order pharmacy, a specialty pharmacy, and a specialty drug distributor. Express transacts business in this District and throughout Mississippi. They can be served with process at C.T. Corporation system located at 645 Lakeland East Dr., suite 101, Flowood, MS 39232.

18.     Defendant MedImpact Healthcare Systems, Inc. ("MedImpact") is a California corporation with its headquartered in San Diego, California at 10181 Scripps Gateway Court. MedImpact is a pharmacy benefit manager and owned entirely by MedImpact Holdings, Inc. Other businesses owned by MedImpact Holdings include Birdi, Inc. (a mail-order pharmacy) and Specialty by Birdi, a specialty pharmacy. MedImpact transacts business in this District and throughout the United States. They can be served with process at C.T. Corporation system located at 645 Lakeland East Dr., suite 101, Flowood, MS 39232.

19.     Defendant Optum, Inc. ("Optum") is a Minnesota corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344, Optum is a wholly owned subsidiary of United. Their registered agent for service of process in Mississippi is C.T. Corporation System, 645 Lakeland East Dr. Suite 101, Flowood, MS 39232.

20.     Defendant OptumRX Holdings, LLC ("Optum Holdings") is a Delaware

corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344, OptumRX Holdings is a wholly owned subsidiary of United and the direct parent company of Optum. They can be served with process at C.T. Corporation system located at 645 Lakeland East Dr., suite 101, Flowood, MS 39232.

21.    Defendant OptumRX Administrative Services, LLC is a Texas corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344. They are registered to do business in Mississippi, and their registered agent for service of process in Mississippi is C.T. Corporation System, 645 Lakeland East Dr. Suite 101, Flowood, MS 39232.

22.    OptumRX, Inc., is a California corporation with their principal place of business at 1100 Optum Circle, Eden Prairie, MN 55344. They are registered to do business in Mississippi and their registered agent is C.T. Corporation System, 645 Lakeland East Dr. Suite 101, Flowood, MS 39232.

23.    United Health Group is a Delaware LLC with its principal place of business at 5995 Opus Parkway, Suite 500, Minnetonka, MN 55343. They may be served with process at C.T. Corporation System, 645 Lakeland East Dr. Suite 101, Flowood, MS 39232.

24.    Defendant GoodRx Holdings ("GoodRx") is a Delaware corporation with its headquarters at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA 90404. GoodRx does business in this District and throughout the country. They can be served with process at 109 Executive Drive, Suite 3 Madison,  MS 39110.

## IV.    FACTUAL BACKGROUND

### A. History of PBMs

25.    A normal prescription drug transaction in the U.S. involves five to eight entities that are usually unknown to the patient getting their prescription filled.

26.     The process begins when a doctor writes a prescription for a patient and sends the prescription to the patient's pharmacy.  Almost all prescriptions are sent electronically using a special network maintained by a third party that both doctors and pharmacies can access.  Once the pharmacy receives a prescription, it submits a claim for the price to be paid by the patient's insurance provider.  The claim does not go directly to the insurance company but to the PBM that the insurance company has contracted with to manage its prescription benefits.  The PBM pays the pharmacy based on opaque and unpredictable reimbursement calculations based on a number of factors, including contracts between payers (health plans) and the PBMs, between PBMs and pharmacies or Pharmacy Services Administrative Organizations ("PSAOs") which contract with PBMs on behalf of small and mid-sized independent pharmacies, between pharmacies and drug wholesalers or manufacturers, and between health plans and their beneficiaries. Doctors write a prescription, and it is sent to the pharmacy electronically. The pharmacy submits a claim to the patient's insurance provider, but that claim does not go straight to the insurance, it goes to the patient's PBM that has contracted with that insurance. The PBM then pays the pharmacy though an opaque and seemingly unpredictable reimbursement. This reimbursement is based on a few things such as contracts between health plans and PBMs, between pharmacies and Pharmacy Service Administrative Organizations (PSAO), and then between beneficiaries and their health plans.

27.     PBMs began to appear in the late 1950s in response to demand for management of prescription drug benefits offered by health insurers.  In the late 1980s, PBMs began to create more significant "pharmacy benefit" services by developing a system for processing prescription drug claims and reimbursing pharmacies.  They now serve as a common intermediary between pharmacies, payers (health insurers, employers, unions, federal and state governments),

pharmaceutical manufacturers, and drug wholesalers. PBMs contract with health insurers, drug manufacturers, and pharmacies to provide distribution, reimbursement, and claim-processing services. PBMs negotiate with drug manufacturers to have their drugs included in the PBMs' formularies (list of drugs covered by a health plan), and they contract with pharmacies to distribute drugs and services to plan members subject to reimbursement rates and fees negotiated by the PBMs. PBMs appeared in the 1950s as the solution for managing prescription drug benefits from health insurers. In the 1980s, the PBMs started played a bigger role by processing prescription drug claims and reimbursing pharmacies. Now they are the middleman between the pharmacies, drug manufacturers, health insurers, manufacturers, and wholesalers.

**B. Vertical Integration and Consolidation of Market Power by PBMs**

28.      In the 1970s a large and continuing process of both vertical and horizontal integration with other entities in the prescription drug market began. By 2023, Express, CVS, and Optum ("Big Three") were responsible for processing 80% of all prescriptions dispensed in the use. Which is a display of their market power and anticompetitive practices.

29.      Additionally, the PBM Defendants are all vertically integrated, meaning they own or are owned by entities that participate at different points in the supply chain for prescription drugs. CVS is a great example of this vertical integration, CVS owns a PBM, pharmacy, mail-order pharmacy, specialty pharmacy, health insurer, health clinics, drug private labeler, and a group purchasing organization.

30.      The FTC stated in a recent report about PBMs:

"All of the top six PBMs [the "Big Six"] are vertically integrated downstream, operating their own mail order and specialty pharmacies, while one PBM [CVS Caremark] owns and operates the largest chain of retail pharmacies in the nation. Pharmacies affiliated with the three largest PBMs now account for nearly 70 percent of all specialty drug revenue. In addition, five of the top six PBMs are now part of corporate healthcare conglomerates that also own and operate some of

the nation's largest health insurance companies, including three of the five largest health insurers in the country. Four of the PBMs are owned by publicly traded parent companies that own affiliates that operate healthcare clinics. Three have recently expanded into the drug private labeling business, partnering with drug manufacturers to distribute drug products under different trade names. Four healthcare conglomerates now account for an extraordinary 22 percent of all national health expenditures, as compared to 14 percent eight years ago.[1]"

31.      All of this consolidation of market power by the PBM Defendants are what grant them the market power over not only nearly all the pharmacies but also the patients filling prescriptions.

32.      A PBM does not always make money on an insurance transaction. Previously they practiced "spread pricing" which is when they charge the insurance company a higher rate than they did the pharmacy, which was a significant source of their revenue. Due to the lack of transparency in the process PBMs use in this practice, the pharmacies cannot tell where spread pricing occurs. Knowledge of this grew and the PBMs faced backlash from it. Due to the backlash, the Defendants turned to weaponizing their vertical integration the market. Recently a big source of revenue for PBMs is specialty drugs, from 2016 to 2023 by 50% or roughly 113 billion.

33.      PBMs are also disproportionately affecting Mississippi and other parts of rural America. According to the FTC's report on PBMs:

"Between 2013 and 2022, about ten percent of independent retail pharmacies in rural America closed. Closures of local pharmacies affect not only small business owners and their employees, but also their patients. In some rural and medically underserved areas, local community pharmacies are the main healthcare option for Americans, who depend on them to get a flu shot, an EpiPen, or other lifesaving medicines."[2]

## C. Prescription Discount Cards

34.      The PBMs have recently discovered how to use discount cards to make more

---

[1] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies,* Interim Staff Report at 2-3 (2024) (internal citations omitted).
[2] See https://www.ftc.gov/reports/pharmacy-benefit-managers-report (the FTC PBM report).

money and limit competition. As mentioned *supra*, they were originally meant to help poorer patients or patients whose insurance did not cover a necessary drug. The pharmacies lose money on them usually but originally agreed to honor them to bring in foot traffic and build customer loyalty.

35.     Discount cards are not the same thing as coupons, but the customer's using them have an almost identical experience. Manufacturer coupons are usually only available for name brand drugs for a short period of time. They reduce the out-of-pocket cost to the customer and the insurance is billed in the normal way. In that scenario, there is a third party (insurance) paying the pharmacy.

36.     The opposite of the above is true when a discount card is used, mostly the same thing happens but there is no third-party to reimburse the pharmacy. The pharmacy actually has to pay the PBM a fee out of the already low out of pocket cost the consumer has to pay. They were originally honored to be used as a marketing tool to get new customers and the pharmacies thought they would only account for a small number of transactions.

37.     After PBMs obtained their massive market power, the PBMs have made taking all of their discount cards a condition of using the PBM. This is required to be an in-network pharmacy even though the pharmacy almost always loses money on these transactions.

**D.  GoodRx and How it Works**

38.     GoodRx was released in 2011 as a place that collected discount cards from most PBMs. If the price on their app was lower than the price the consumer would pay with insurance, the consumer could choose to use the discount card off of the app. When that happens the patient's insurance is not billed, and no cost is applied to their deductible. GoodRx markets these discount cards as coupons, but they are discount cards.

39.     The base of GoodRx's business is to analyze pricing data from PBMs, which it then uses to find the cheapest discount card to offer the patient. This is done though their proprietary "pricing enginge."

40.     Consumers used to have to manually check GoodRx's app or website to access their discount cards. The claim would be submitted to the PBM with the discount card, not necessarily the patient's PBM. For every one of these transactions a fee was charged to the pharmacy and split between GoodRx and the PBM. GoodRx has stated that they receive roughly 15% of the retail price on every transaction.

41.     In the type of transaction described immediately above, there is no third-party to reimburse a pharmacy. Instead, the pharmacy only gets what the patient is charged and then has to pay the PBM fee out of this money. GoodRx went public in 2020 and continues to grow rapidly.

### V.  OPTUM

42.     This Defendants' conduct would not have even been discovered if it were not for Mississippi law. Miss. Code Ann. §§ 73-21-151 through Miss. Code Ann. 73-21-163 (the Pharmacy Benefit Prompt Pay Act) and Miss. Code Ann. §§ 73-21-175 through Miss. Code Ann. § 73-21-189 (the Pharmacy Audit Integrity App).

43.     The Mississippi Board of Pharmacy ("The Board"), released a two-page report detailing the audit of the Optum Defendants and their commercial prescription drug claims for 2022. The audit showed the Optum Defendants use 49 MAC lists, 22 of which have prices used solely for claims at chain pharmacies and 15 used solely for independent pharmacies. The Board Report detailed the shockingly brazen and illegal conduct of the Optum Defendants as follows:

a. The Board's 2022 analysis of 992 GPI-12 codes (12-digit codes used to specify drugs) between exclusive lists revealed that independent pharmacies got MAC reimbursement rates that were 74% lower than the ones given to chain pharmacies.

b. Nearly all, 99.7%, of generic drugs were reimbursed using the MAC list at independent pharmacies. Only 88% of generic drugs from chain pharmacies were reimbursed using the MAC list. Even worse, 77.7% of generic drug claims at affiliated pharmacies were reimbursed using the average wholesale price six times more often than at independent pharmacies.

c. 81.9% of the time, patients had to pay the entire cost of the drug when using an independent pharmacy. Compared to only 63.4% at chains and 46.1% at affiliated pharmacies.

d. The most shocking thing is that independent pharmacies were paid 145% less for generic drugs than Optum's affiliated pharmacies. Chains were paid 19% less, meaning the Defendant PBMs are profiting most from their illegal conduct at independent pharmacies.

## VI.    ANTICOMPETITIVE CONDUCT

### A. The Partnerships Between Defendants to Facilitate Price Fixing

44.    Beginning in 2022, GoodRx announced new business partnerships with Express Scripts, CVS, and Medimpact. This is where the out of pocket cost used in a discount card transaction began being applied to the patient's deductible.

45.    The first partnership was with Express Scripts and began providing seamless

access through Express Scripts to GoodRx's discount cards. Meaning instead of going to the patient going to the app or website to get this themselves and choosing whether or not to use it, the process became automatic and non-optional. This started in early 2023.

46.     In 2023, GoodRx announced three more "partnerships."

47.     July 12, 2023, GoodRx announced a partnership with CVS, which did essentially the same thing as the partnership with Express Scripts. It made the discount card process non-optional for the consumer. This began on January 1, 2024.

48.     Medimpact and GoodRx partnered to, again, achieve the same above result. Making the discount card process non-optional. This started on January 1, 2024.

49.     These programs were separately announced but functioned the same and each Defendant entering into one knew of the others doing the same.

50.     The result of these arrangements is a new process that occurs automatically, GoodRx was now incorporated into the transaction without the consumers knowledge. Meaning discount card transactions became much more numerous and that meant pharmacies lost much more money. Large chains may be able to offset this, but not small independent pharmacies.

51.     The following is the resulting process: 1) the pharmacy fills a generic prescription and the claim is submitted to their PBM; 2) the PBM checks GoodRx's system for a discount card from another PBM that is lower than the cost would be with the patient's insurance; 3) if one is found, the claim is sent to the PBM offering the discount card; 4) that price paid by the patient is applied to their deductible; 5) patient pays the discount card price to the pharmacy; 6) the pharmacy pays a fee to the discount card PBM; 7) the discount card PBM sends a part of that fee to GoodRx; 8) and finally, GoodRx sends a portion of that fee to the patient's PBM. This process makes GoodRx and the PBMs a lot more money, but it is at the expense of the pharmacy

getting paid at not only the lowest possible price but the lowest possible price minus the fee they have to pay. This fee is what makes this more profitable than regular transactions.

**B.  Harm to Competition**

52.      These agreements the PBMs participate in with the Defendants is price fixing and an exertion of their massive market power accumulated by choking out competitors through anticompetitive conduct over a period of decades. Additionally, where the few PBMs there are used to compete with each other, now they all work together with GoodRx to ensure they make the most money at the expense of the pharmacies getting paid the lowest possible amount on the maximum number of transactions.

53.      Independent pharmacies are hurt the most, as the FTC put in its report, the PBMs view these independent pharmacies as competition instead of a PBM customer. The FTC report stated:

> "In addition to increasing their market power from consolidation, leading PBMs have vertically integrated not only with their own retail pharmacies, but also with specialty and mail order pharmacies.  This vertical integration may be increasing PBMs' ability and incentive to disadvantage rival, independent pharmacies that directly compete with the PBMs' affiliated pharmacies.  One internal PBM document-from a PBM that does not operate a retail pharmacy – makes clear that smaller, unaffiliated pharmacies are viewed as competitors with even the PBMs' non-retail affiliated pharmacies: "Retailers are our competitors. There is no win-win solution. We are seeking the same Rx. We need the best rates."[3]

Thus, PBMs are incentivized to disadvantage the independent pharmacy in favor of their affiliated or chain pharmacies.

54.      Most independents lack the resources to understand the complex pricing process

---

[3] Fed. Trade Comm'n, *supra* note 1, at 54.

the PBMs have set up. In 2016, a survey of 600 independent pharmacies showed two thirds have no details on how their final reimbursement rate was reached.[4] The PBMs have intentionally made this process overly secretive and complicated in order to best obscure their anticompetitive conduct.

55.     The pharmacies are reimbursed from the lowest cost amongst either the average wholesale price (AWP), wholesale acquisition cost (WAC), usual and customary price (U&C), submitted cost, or the most favored maximum allowable cost (MAC). PBMs even change prices days, months, or weeks later, clawing back even more money from the pharmacy. Again, this ensures the pharmacy receives the least amount of money possible on as many transactions as possible, with the PBM Defendants favoring their affiliates over independents.

56.     Independent pharmacies do not have access to the streams of revenue generated from vertical integration and market power on which PBMs and their affiliated pharmacies depend, including (but not limited to) revenue from specialty drugs and fees on discount card transactions. This tilts the playing field in favor of PBM-affiliated pharmacies, who can use their monopoly profits to cover losses on more traditional prescription dispensing services.  As the PBMs know, independent pharmacies do not have that luxury.  A large and rapidly growing number of independent pharmacies have had to close their businesses as a direct result of PBMs' anticompetitive conduct, thereby dampening competition and augmenting the market power of vertically integrated PBMs, including the PBM Defendants. Independent pharmacies are obviously not vertically integrated like the PBMs, so they lack that revenue. This is what tilts the favor to the affiliated or chain pharmacies who can use their monopoly profits to make up losses.

---

[4] Nat'l Cmty. Pharmacists Ass'n, *Survey of Community Pharmacies: Impact of Direct and Indirect Remuneration (DIR) Fees on Pharmacies and PBM-Imposed Copay Clawback Fees Affecting Patients* (June 2016), https://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf.

This anticompetitive conduct has led to thousands of pharmacies closing. A survey of 10,000 pharmacies in 2024 showed a third of them were thinking of closing in 2024.

**C. Optum in Mississippi**

57.    As stated *supra,* this Defendants' conduct would not have even been discovered if it were not for Mississippi law. Miss. Code Ann. §§ 73-21-151 through Miss. Code Ann. 73-21-163 (the Pharmacy Benefit Prompt Pay Act) and Miss. Code Ann. §§ 73-21-175 through Miss. Code Ann. § 73-21-189 (the Pharmacy Audit Integrity App).

58.    The Mississippi Board of Pharmacy ("The Board"), released a two-page report detailing the audit of the Optum Defendants and their commercial prescription drug claims for 2022. The audit showed the Optum Defendants use 49 MAC lists, 22 of which have prices used solely for claims at chain pharmacies and 15 used solely for independent pharmacies. The Board Report detailed the shockingly brazen and illegal conduct of the Optum Defendants as follows:

    a.  The Board's 2022 analysis of 992 GPI-12 codes (12-digit codes used to specify drugs) between exclusive lists revealed that independent pharmacies got MAC reimbursement rates that were 74% lower than the ones given to chain pharmacies.

    b.  Nearly all, 99.7%, of generic drugs were reimbursed using the MAC list at independent pharmacies. Only 88% of generic drugs from chain pharmacies were reimbursed using the MAC list. Even worse, 77.7% of generic drug claims at affiliated pharmacies were reimbursed using the average wholesale price six times more often than at independent pharmacies.

    c.  81.9% of the time, patients had to pay the entire cost of the drug when using an independent pharmacy. Compared to only 63.4% at chains and 46.1% at affiliated pharmacies.

    d.  The most shocking thing is that independent pharmacies were paid 145% less for generic drugs than Optum's affiliated pharmacies. Chains were paid 19% less, meaning the Defendant PBMs are profiting most from their illegal conduct at independent pharmacies.

59.     The audit for Optum in Mississippi was just for the year 2022, which indicates that the illegal conduct of Optum and the other Defendants extends well beyond 2022.

**D. Independent Pharmacies**

60.     The closure of the pharmacies is negatively impacting the quality of the care patients receive. For example, independent pharmacies are more likely to use new resources, technology, and software to improve their services. This is because they can more easily implement these things than large pharmacies because of their size and corporate policies and formalities that must be followed.

61.     Independent pharmacies are also more likely to be integrated more deeply into the community and have a closer relationship to the customers. This, for instance, is demonstrated when a patient has a complicated or special medicine, the pharmacist provides more personalized and individualized care to that person. Again, in rural areas, the local independent pharmacy may be one of the main or only source of healthcare and patients' only option to fill prescriptions and get vaccines. Imagine, if during the COVID-19 pandemic, a rural town's only pharmacy shut down, and when the vaccine came out, the people who really needed it could not get to it. People

in home care, who can't drive due to a condition, or the elderly, would have been left vulnerable in such a situation.

## VII.    RELEVANT MARKET AND MARKET POWER

62.        The relevant market is the market for reimbursements for prescription drugs paid to Mississippi pharmacies ("relevant market"). Pharmacy services are provided by the Plaintiff to the PBM Defendants, on behalf of insurers or other third-party payers.

63.        The effects of the Defendants' anticompetitive conduct that is describe *supra* provides sufficient evidence that the Defendants have significant market power in the relevant market.

64.        The Big 3 PBMs, Defendants CVS, Express Scripts, and Optum, process almost 80% of the prescriptions drug claims made in the U.S., up from 70% in 2016. The Big 6, CVS, Express Scripts, Optum, Humana, Prime Therapeutics, and Medimpact, process over 90% of the prescription drug claims made in the United States. The PBM Defendants provide coverage for over 60% of the United States' eligible population. This means the Plaintiff has no choice but to do business with them, because it is either do business with the Defendants and the pharmacy dies out slowly or stop and die out almost immediately. Those are the choices the Plaintiff faces.

65.        Each Defendant is a subsidiary entirely owned by some healthcare entity that also owns retail pharmacies, mail-order pharmacies, specialty pharmacies, health insurance companies, and various other types of businesses in this market.

66.        The pertinent geographic market in the case at bar is the state of Mississippi. The healthcare industry in Mississippi is subject to a unique blend of federal and state laws along with other regulations, which only exist all together in Mississippi. The relevant market is not smaller than Mississippi, because the PBMs operate statewide.

67.     The Defendants, both together and separately, have market power sufficient to cause harm to the competition in the relevant market, and they do.

## VIII.   RELEVANT PERIODS

68.     The relevant period in this case is 2021 and is continuing currently. In 2021 the PBM Defendants even further cornered the relevant market. The PBM Defendants have been steadily narrowing the relevant market by acquiring various businesses in the relevant market from 2000 to the present. Beginning in 2000 with roughly 39 entities in this market, to now 3 as of 2021 that process the vast majority of transactions in this relevant market.[5]

## IX.    PLAINTIFF ALLEGATIONS

69.     The named Plaintiff operates 1 drug store location and receive reimbursement from all of the PBM Defendants.

70.     Plaintiff received lower reimbursements for dispensing generic prescription drugs and/or paid increased fees to PBMs resulting from discount card transactions as a result of transactions with the Defendants.

71.     This was in direct violation of the Mississippi Pharmacy Benefit Prompt Pay Act and only made possible by the Defendants' using their massive market power to force the pharmacy to take what it offered.

## X.     ANTITRUST INJURY

72.     Defendants' anticompetitive conduct caused Plaintiff to suffer antitrust injury in the form of:

(a)    Decreased reimbursements for dispensing generic prescription drugs, specialty drugs, and name brand drugs:

(b)  Increased fees to Defendants resulting from discount card transactions; and

---

[5] Fed. Trade Comm'n, at 10, figure 3.

(c) Reduced competition in the Relevant Market.

(d) Reduced revenue and potential closure.

73.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

## XI. ARBITRATION

74.    The Plaintiff may have signed an arbitration agreement with one or more of the named Defendants. Such agreements are invalid and unenforceable for a variety of reason, including but not limited to:

a.    Substantive unconscionability, due to the Plaintiff having a lack of a meaningful choice in signing the agreement and terms that unreasonably favor one or more of the Defendants.

b.    Fraud, because the Defendants fraudulently clawed back money from reimbursements weeks after they should have been final under Mississippi law. PBM Defendants are also supposed to have a reasonable appeal procedure for reimbursements, according to Mississippi law. While one exists, it is so deliberately complicated and frustrating, so they discourage anyone from using them.

c.    Duress, because the Defendant PBMs control well over 80% of the prescription claims processed in the entire country, the Plaintiff has no choice but to sign the agreements presented to them by the PBMs. The alternative to not signing is almost immediate closure.

d.    Unclean hands, the Defendants came to the bargaining table for any potential agreements with the Plaintiff with unclean hands. For years the Defendants have

been breaking both federal and state antitrust laws and the Mississippi Pharmacy

Prompt Pay Act.

e.    Undue influence, due to the PBM Defendants market power in the relevant

market, the Plaintiff was unduly influenced into entering any agreement.

f.    Illegality, the agreement is illegal in that the agreement the Plaintiff signed with

any PBM set the reimbursement rate for drugs. The reimbursement rates given

were often given in violation of Mississippi statute, since all pharmacies must be

reimbursed at the same price and this was not happening. Pharmacies affiliated

with the PBM Defendants and chain pharmacies are heavily favored.

75.    For the above reasons, any arbitration agreement or any agreement the Plaintiff

may have entered with any of the Defendants is unenforceable. Additionally, suits like this have

been filed across the country in various jurisdictions for the exact same conduct. This creates a

need for the judiciary to resolve the issues described herein, and set a consistent precedent,

instead of varying ones.

## XI.    CLAIMS FOR RELIEF

### COUNT 1

**Price Fixing in Violation of Section 1 of the
Sherman Act (15 U.S.C. § 1)**

76.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

77.    During the relevant period, the Defendants conspired to engage in a conspiracy,

combination, or contract to unreasonable restrain trade. This was done in violation of Section 1

of the Sherman Act (15 U.S.C. §1).

78.    The conspiracy, combination, or contract consisted of agreements amongst the

Defendants, these agreements fix, maintain, stabilize, or reduce overall reimbursements at extremely and artificially low levels.

79.     Plaintiff has been injured and will continue to be injured in the form of under-reimbursement for prescription generic drugs, specialty drugs, and name brand drugs.

80.     Defendants' anticompetitive conduct had the following effects, among others:

> (a) The reimbursements paid to Plaintiff for prescriptions of all types have been fixed, stabilized, or maintained at artificially low levels;
>
> (b)  Plaintiff has paid higher fees to Defendants; and
>
> (c)   Plaintiff has been deprived of the benefits of free and open competition between and amongst Defendants.

81.     The conduct, viewed under the *per se* standard, is entirely unlawful. Alternatively, the Defendants' conduct is illegal under the "quick look" or rule of reason standards.

82.     Defendants' conduct lacks a non-pretextual precompetitive jurisdiction that offsets the harm caused by Defendant's anticompetitive and unlawful conduct.  Moreover, even if there were valid precompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition. The Defendants' conduct cannot be justified by any precompetitive justification that sufficiently offsets the harm cause by the Defendants' and their conduct. Even if there was a sufficient justification, the same end could have been achieved by other means.

83.     Plaintiff is entitled to treble damages, attorneys' fees and costs, pre and post judgment interest to the highest applicable extent, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

**AGREEMENTS TO UNREASONABLE RESTRAIN TRAD IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**

84.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

85.    During the relevant period, the Defendants knowingly entered into contracts, combinations, or conspiracies to unreasonably restrain trad in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

86.    Collectively, the PBM Defendants have significant market in power in the Relevant Market.

87.    GoodRx and the PBM Defendants have entered into agreements with each other that harm competition in the relevant market by suppressing prices and reimbursements to the Plaintiff.

88.    These agreements between PBM Defendants and GoodRx are an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

89.    Defendants have no justification to offset the harm caused by their conduct. Even if there was, the same goal could have been achieved by other means.

90.    Plaintiff is entitled to treble damages, attorneys' fees and costs, pre and post judgment interest at the maximum allowable rate, and an injunction against Defendants to end the ongoing violations alleged herein.

**COUNT 3**

**VIOLATION OF THE MISSISSIPPI PHARMACY BENEFITS PROMPT PAY ACT
MISS. CODE ANN. § 73-21-151 THROUGH § 73-21-163**

91.    Plaintiff realleges the above allegations as if fully set forth herein.

92.    At all relevant times, each of the Defendants violated Miss. Code Ann. § 73-21-

151 through § 73-21-163. Otherwise known as the Mississippi Pharmacy Prompt Pay Act, which requires them to reimburse any pharmacy the same as they would one of their affiliated pharmacies. Miss. Code Ann. § 73-21-156(5) is particularly pertinent, stating that a PBM cannot reimburse a non-affiliated pharmacy less than it does an affiliated pharmacy.

93.    Miss. Code Ann. § 73-21-156(3) has been violated by Defendants because they did not supply the Plaintiff with their MAC lists.

94.    Miss. Code Ann. § 73-21-156(4) has been violated because there is no reasonable administrative appeal process to challenge MAC reimbursements and cost lists. There is a procedure in place, but it is overly complicated and unreasonable.

95.    Defendants reimbursed their affiliated pharmacies at rates much higher than they reimbursed the Plaintiff.[6]

96.    By doing so, Defendants caused Plaintiff injury in an amount to be determined at trial. Including but not limited to economic damages in the form of lower revenue and loss of business.

## COUNT 4

## VIOLATION OF MISSISSIPPI ANTITRUST STATUTES

97.    Miss. Code Ann. § 75-21-3 has been violated through the Defendants' actions in exerting consolidated market power and unequal bargaining power to fix prescription drug prices and reimbursement rates at artificially low levels. Done by a combination, trust, or conspiracy.

98.    Due to the above, the Defendants are subject to the penalties set out in Miss. Code Ann. 75-21-9 and should be subjected to the most severe of those penalties due to the flagrancy and scale of the Defendants' illegal conduct.

99.    Liability for the above-mentioned violations of Mississippi law is assigned by

---

[6] Mississippi Board of Pharmacy, Optum Audit at 2.

Miss. Code. Ann. § 75-21-35.

## **PRAYER FOR RELIEF**

1. The Plaintiff respectfully requests:

   a. An award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

   b. The Court enjoin Defendants, ordering them to cease and desist from similar unlawful activities in violation of the Mississippi Pharmacy Benefits Prompt Pay Act, the Sherman Act, the Clayton Act, and Mississippi Antitrust statutes;

   c. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

   d. For injunctive relief requested by Plaintiff, including but not limited to injunctive and other equitable relief as is necessary to protect the interests of Plaintiff;

   e. For prejudgment interest on all amounts awarded, at the prevailing legal rate;

   f. Find that Defendants have entered into a contract, combination, or conspiracy to fix, raise, stabilize, or maintain reimbursements charged to Plaintiff for prescription drugs at artificially low levels in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

   g. Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff for treble damages sustained by Plaintiff, as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre-and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law;

h.  Find that Defendants violated the Mississippi Pharmacy Benefits Prompt Pay

Act, Miss. Code Ann. § 73-21-151 through § 73-21-163;

i.  Find that Defendants have violated Miss. Code Ann. § 75-21-3, that liability

for that is established by Miss. Code. Ann. § 75-21-35, and that the

Defendants are subject to the most severe penalties allowed by Miss. Code

Ann. § 75-21-9;

j.  For all other orders, findings, and determinations identified and sought in this

Complaint.

## JURY DEMAND

Plaintiff hereby demands a jury trial for all issues triable by jury pursuant to Rule

38 of the Federal Rules of Civil Procedure.

This, the 1ST day of April, 2025.

Respectfully submitted,
*/s/ James D. Shannon*
*/s/ Tinsley J. Brooks*
ATTORNEYS FOR PLAINTIFF


James D. Shannon (MSB# 6731)
Tinsley J. Brooks (MSB# 106786)
SHANNON LAW FIRM, PLLC
100 W. Gallatin St.
Hazlehurst, MS 39083
T: 601-894-2202
F: 601-894-5033
jshannon@shannonlawfirm.com
tbrooks@shannonlawfirm.com